
FILED
IN OPEN COURT

JUL 9

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:11-CR-95 |
| | ) | |
| SUSANNE D. RÜEGG MEIER | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

The parties stipulate that the allegations in Count One of the Superseding Indictment and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt.

### INTRODUCTION

1.  Defendant Susanne Rüegg Meier (hereinafter "Rüegg Meier" or "Defendant"), age 56, is a citizen and resident of Switzerland. Rüegg Meier earned both bachelors and master's degrees in business from universities in Zurich, Switzerland.

2.  From in or about 1985 through in or about 1995, and from 1998 through in or about 2011, Credit Suisse AG, or an entity owned or partially owned by Credit Suisse AG (collectively, "Credit Suisse"), employed Rüegg Meier in a variety of positions, including: as an assistant in the private bank in Zurich; as a trainee at Swiss American Securities in New York, New York; as a relationship manager on the International Desk and the North American desk of the private bank at Credit Suisse in Zurich; and as the team head of the North American desk in Zurich.

15608866 1

3. In or about 1999, the Defendant began working as a relationship manager on an international desk in one of Credit Suisse's Zurich offices. The defendant provided services for clients from throughout the world, including a small number of clients who were from the United States.

4. Beginning in or about 2002 and continuing through in or about 2011, within the Eastern District of Virginia and elsewhere, the Defendant did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with other persons known and unknown to the United States Attorney to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service ("IRS") of the Treasury Department in the ascertainment, computation, assessment, and collection of revenue: to wit: U.S. income taxes of various U.S. persons, in violation of Title 18, United States Code, Section 371.

5. In or about September 2001, the Defendant began working as a relationship manager on Credit Suisse's North American desk in the Zurich office, where she provided banking services for both declared and undeclared accounts of U.S. taxpayers and others. The Defendant kept approximately five of her U.S. clients from the international desk. Over time, management assigned the Defendant additional clients from other relationship managers on the North American desk and through re-assignments from other desks within Credit Suisse's private bank as a result of Credit Suisse's decision to centralize its U.S. clients at the North American desk.

6. At or around the time at which the Defendant joined the North American desk, she received training on Credit Suisse's policies regarding U.S. persons.

7. In or about July 2002, Markus Walder, who was then the desk head of the North American desk, recruited the Defendant to take over the position as manager of the team of bankers working in Zurich. The Defendant supervised several relationship managers and assistant relationship managers who served clients from the United States, as well as other countries. As part of her managerial duties, Rüegg Meier was allocated performance targets for the North American desk, including acquisition of net new assets and sales targets, and she divided those goals among the relationship managers on the North American Desk. In addition to her managerial duties, the Defendant continued to provide banking services for U.S. clients, who primarily resided in New York, Florida and Chicago.

8. As the head of the Zurich team, the Defendant, over time, became responsible for supervising the servicing of accounts involving over 1,000-1,500 client relationships. Defendant also was personally responsible for servicing the accounts of approximately 140-150 clients, about 95% of whom were U.S. persons, which held assets under management totaling approximately $400 million; the largest of these accounts held assets worth approximately $40 million.

9. Credit Suisse management required relationship managers on the North American desk to achieve certain quantitative and qualitative targets, such as new assets under management; revenues from clients; and new accounts which Credit Suisse could manage, also known as "discretionary mandates." Upper management imposed goals on Markus Walder, who pressured Rüegg Meier to achieve the performance goals for accounts which she personally managed, as well as for the North American desk, and if she was unable to do so with her current

3

client base, then either to find new clients or to obtain new assets under management from existing clients.

10. In or about February 2002, co-conspirator Michele Bergantino joined the North American desk to work as a relationship manager to service both undeclared and declared accounts of U.S. taxpayers and others. The Defendant also supervised co-conspirator Emanuel Agustoni, who worked as a relationship manager on the North American desk and reported to the Defendant until he left the North American desk in or about 2005.

11. In or about late 2010, the Defendant was promoted to manage Region Canada International, which served primarily Canadian clients, as well as a few remaining U.S. clients.

### RÜEGG MEIER KNEW U.S. CUSTOMERS USED THEIR CREDIT SUISSE ACCOUNTS TO EVADE TAXES, AND SHE ASSISTED THEM IN THEIR EVASION

12. The Defendant knew, or had reason to know, that many of her U.S. clients utilized their accounts at Credit Suisse to evade their U.S. income taxes, arising either from admissions that clients made to her or from other actions taken by her clients which indicated that they were evading U.S. income taxes, including the following:

> a. At least one U.S. client specifically told Rüegg Meier that the client desired and intended to conceal their Credit Suisse account from U.S. authorities, and repeatedly asked Rüegg Meier questions about how the client could transfer assets in the Credit Suisse account without disclosing the transfers to U.S. authorities.
>
> b. Rüegg Meier generally advised her clients that she could not provide tax advice. However, various U.S. clients occasionally stated their concerns that

4

they were not properly reporting their assets held in the Credit Suisse accounts in accordance with the U.S. tax laws. For example, on one occasion, a U.S. client who controlled assets in a nominee tax haven foundation asked the Defendant how the Defendant would respond if another individual inquired whether there was an account in the client's name. Rüegg Meier responded that if the person did not have formal power of attorney over an account, then Rüegg Meier could not disclose the existence or non-existence of an account to the inquirer.

c. Various U.S. clients instructed Credit Suisse to hold their account statements and other correspondence in Switzerland, and not to send any mail to their U.S. addresses. Rüegg Meier knew that most of the customers with such "hold mail" accounts did not request from either Rüegg Meier or Credit Suisse any supporting documentation or information needed to prepare U.S. income tax returns. Rüegg Meier understood that accurate reporting of income would have required each U.S. customer to request specific financial information from Credit Suisse on an annual basis, regarding interest, dividends, capital gains, etc., for each account held. Some of Rüegg Meier's U.S. clients requested that Credit Suisse issue tax statements so that they could report ownership of their Credit Suisse accounts, and the income earned on the assets in the accounts, to the IRS.

d. In or about 2003-2004, Credit Suisse's branch in the Bahamas closed U.S. customers' accounts. A Credit Suisse banker in the Bahamas assisted U.S.

15608866 1

clients in transferring their assets to newly opened accounts in Zurich, including several who opened accounts with Rüegg Meier. Rüegg Meier knew that the Credit Suisse clients were opening accounts in Zurich in order to continue the concealment of the assets and income from the IRS.

e. Rüegg Meier and other Credit Suisse employees used euphemisms or other language internal to Credit Suisse that indicated that they knew certain U.S. clients' accounts held undeclared assets. For example, the Credit Suisse employees referred to clients who did not wish to disclose their true ownership of their accounts as "Non-Comprehensive Advice Seeking Clients," though it was commonly understood that these were clients who did not wish to disclose their assets held in Credit Suisse accounts to U.S. authorities.

13. Despite having the knowledge that many U.S. clients used their Credit Suisse accounts to evade U.S. taxes, Rüegg Meier took no action either to recommend the closure of the clients' accounts or to inform the Legal and Compliance department of the clients' illegal conduct. It was Rüegg Meier's understanding that the Legal and Compliance department was not interested in hearing about clients' conduct that might violate the laws of countries other than Switzerland.

14. Rüegg Meier assisted U.S. persons in a number of ways that facilitated the concealment of their undeclared financial accounts from the U.S. Treasury Department and the IRS, including the following:

a. Rüegg Meier assisted U.S. customers in obtaining cash withdrawals at locations outside Switzerland, including Credit Suisse's subsidiary in the Bahamas.

b. Rüegg Meier assisted U.S. customers in obtaining travelers checks and bank checks in order to access the funds in their offshore accounts. At times, at the customers' direction, the Defendant broke down the total sum to be withdrawn into separate transfers in amounts that were each below $10,000. For example, on or about August 19, 2004, the Defendant sent two bank checks issued by Credit Suisse, each in the amount of $9,923.43, via courier to an individual, identified in the Superseding Indictment as Customer 7, in Palm Beach Gardens, Florida. On or about May 19, 2005, the Defendant caused two additional bank checks, each in the amount of $9,923.46, to be sent via courier to Customer 7 in Palm Beach Gardens, Florida. On or about October 30, 2008, the Defendant caused two additional bank checks, each in the amount of $9,931.22, to be sent via courier to Customer 7 in Palm Beach Gardens, Florida.

c. Rüegg Meier referred U.S. clients who were interested in creating structures to hold their assets to retain the services of Josef Dörig. Rüegg Meier took this action, despite having knowledge that the clients were U.S. persons, were subject to U.S. tax laws, and were using the nominee entities to conceal their assets from the IRS.

15608866 1

## RÜEGG MEIER AND HER SUBORDINATES TRAVELED TO THE UNITED STATES IN ORDER TO FURTHER THE SCHEME

15. Between in or about 2002 and continuing through in or about 2008, the Defendant traveled to the United States from Zurich to meet with U.S. clients. The Defendant met her clients, among other places, in the Credit Suisse's Representative Office in New York.

16. The Defendant's official business travel to the United States to meet with U.S. clients with both declared and undeclared accounts was an essential part of the scheme to defraud. Rüegg Meier first visited clients in the United States in or about 2002 in the company of a relationship manager from whom Rüegg Meier inherited many of Rüegg Meier's clients. From in or about 2002 through in or about 2008, Rüegg Meier traveled approximately 2 times per year to the United States, each trip lasting approximately 2 weeks, and Rüegg Meier would visit approximately 4-5 clients each day during the trip, for a total of about 40-50 client meetings per trip.

17. Some of the relationship managers on the North American desk traveled to the United States to meet with clients. Prior to each trip, each traveler submitted a general memorandum to the traveler's supervisor setting forth the travel itinerary, a list of existing and prospective clients they intended to visit, and a discussion of the goals and objectives to be achieved during each trip. For example, Bergantino and Agustoni presented their travel requests to Rüegg Meier for approval. After she endorsed the requests, Rüegg Meier forwarded them to Markus Walder for final approval. For her own trips, Rüegg Meier prepared travel memoranda for Walder's approval. After completion of the trips, the travelers submitted a Travel Report Summary to their supervisor detailing each client visited and their

8

accomplishments, including new assets under management, accounts opened, and other services provided.

18. In or about 2006, Credit Suisse issued an internal directive which prohibited relationship managers from soliciting investments from U.S. clients, and which only permitted them to travel at the invitation of U.S. clients for social purposes. Walder directed the North American desk personnel to document that their trips were only of a social nature, even though they were traveling for business purposes. The Defendant had several conversations with Walder about Walder's travel instruction, and that it contravened Credit Suisse's internal directive. Walder emphasized to Rüegg Meier that it was her responsibility to meet Credit Suisse's performance goals, regardless of the Credits Suisse internal directive, and that Rüegg Meier had to do whatever it took in order to meet those goals.

19. On another occasion, after completing a trip to the United States, the Defendant submitted a Travel Report Summary to Walder for approval. Walder ordered Rüegg Meier to amend her report to reflect that the travel had not been for business purposes, in order to meet the requirements of the Credit Suisse internal directive. Rüegg Meier refused to change the report.

20. In addition to manipulating the information entered on Travel Report Summaries, Markus Walder also sought to conceal the extent to which relationship managers on the North American desk were transacting business with U.S. clients during their trips to the United States. At one point, the North American desk underwent an internal audit by a Credit Suisse compliance function. During the course of the audit, Walder instructed the North American desk personnel that, if they were questioned about Travel Report Summaries, they should say that none existed.

15608866 1

21.     Rüegg Meier took a number of steps to prepare for each trip to the United States to ensure that she concealed the nature and purpose of her visits from U.S. law enforcement. As Credit Suisse had no formal program to instruct bankers on the steps they should take when traveling in order to conceal their activities and purpose, Rüegg Meier learned the tactics to employ as a matter of course from more seasoned bankers on Credit Suisse's North American desk.   Rüegg Meier's co-workers taught her never to travel either into or out of the United States with account statements in her possession.   The information technology systems maintained by Credit Suisse provided relationship managers the option to obtain "travel" account statements that bore no logo and were devoid of either account or customer identification information.   Prior to departing for the United States, Rüegg Meier obtained travel account statements for each client she intended to visit and sent packages of the statements via private courier to hotels where he intended to stay, or she arranged to have statements prepared for clients at Credit Suisse's New York representative office.

22.     Credit Suisse provided Rüegg Meier and other travelers with business cards that carried no logo for them to use when traveling to the United States.   The cards had only the travelers' names, an alternative street address for Credit Suisse, that is a street address for the rear entrance to the office where the Defendant actually worked, and office numbers.   Rüegg Meier understood that Credit Suisse provided her with logo-less business cards in order to assist her in concealing the nature and purpose of her business.

23.     In order to conceal her activities from U.S. authorities, Rüegg Meier intentionally misled immigration and customs authorities when entering the United States.   When Rüegg Meier traveled to New York, she stated that she was traveling for both business purposes and

10

social purposes, because Credit Suisse maintained a New York representative office. However, when Rüegg Meier traveled other places, such as to Miami, she falsely advised immigration and customs authorities that she was engaged only in private travel.

24.  While traveling in the United States, Rüegg Meier met with her U.S. customers in Credit Suisse representative offices, hotels, restaurants or in the clients' homes. During those meetings, Rüegg Meier and the U.S. customer reviewed account statements and, in the process, Rüegg Meier provided investment advice to the U.S. customer. Most U.S. customers had instructed Rüegg Meier not to mail account statements to them in the United States. In those circumstances, Rüegg Meier's visits were the U.S. customer's only opportunity to review documentation of their account's investments and performance, unless the clients could be convinced to travel to Switzerland.

25.  On several occasions, when Rüegg Meier met with clients at the Credit Suisse New York representative office, Roger Schaerer, the head of the New York Representative Office, attended. Schaerer told clients that he was Credit Suisse's "ambassador in the United States," and encouraged clients to contact him if they had any need for services, such as executing power of attorney forms or other account formalities.

26.  Although neither Rüegg Meier nor Credit Suisse were licensed to conduct banking in the United States or provide investment advice, Rüegg Meier regularly provided investment advice to U.S. customers and took instructions for the purchase or sale of securities and the transfer of funds from the account.

15608866 1

## RÜEGG MEIER ASSISTED U.S. CLIENTS IN USING NOMINEE TAX HAVEN ENTITIES TO CONCEAL THEIR BENEFICIAL OWNERSHIP OF ACCOUNTS

27. Approximately 20-30 of Rüegg Meier's U.S. customers concealed their ownership and control of their Credit Suisse accounts by holding those accounts in the names of nominee tax haven entities, also known as structures, which were frequently created in the form of foreign partnerships, trusts, corporations or foundations. Rüegg Meier inherited a large numbers of these accounts from her predecessors. Rüegg Meier understood that a number of her U.S. accountholders utilized structured accounts in order to conceal the U.S. customer's ownership from the U.S. Treasury Department and the IRS, among other U.S. government agencies.

28. Rüegg Meier occasionally dealt with Josef Dörig of Dörig Partner AG in regard to the formation and maintenance of structures on behalf of clients, including U.S. customers. While Rüegg Meier usually did not advise U.S. customers to form structures for their financial accounts, Rüegg Meier knew that Dörig assisted a number of her and other relationship managers' U.S. clients and others with forming and maintaining structures for the purposes of arranging generational transfer of the assets, as well as concealing the true ownership of the financial accounts.

29. Credit Suisse maintained a "Form A" in each accountholder's file. The Form A recorded the identity of the beneficial owner of the account. Forms W-8BEN, Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding, were used for, among other things, documenting that the beneficial owner of assets held by a structure in an account at Credit Suisse was not a U.S. person. On numerous occasions, Dörig submitted false Forms W-

12

15608866 1

8BEN to Credit Suisse through Rüegg Meier, Bergantino and other relationship managers. The Forms W-8BEN that Dörig provided to Credit Suisse falsely represented that the nominee tax haven entity, or structure, was the beneficial owner of the assets in the undeclared account, and not the actual owner, the U.S. customer.

30. U.S. clients used the structures to create the appearance that the account assets were owned by the structures and controlled by independent fiduciaries, such as Dörig, and that the U.S. clients had no ownership interests in the assets. However, the U.S. clients, the relationship managers and the fiduciaries all treated the accounts as though they were really controlled by the clients. For example, only fiduciaries, like Dörig, had written authority to direct activities in the accounts. Nevertheless, the Defendant routinely met with the U.S. clients and took instructions from them, and later sought a written order from Dörig to ratify the instructions and to make it appear as though that Dörig had issued the instructions.

### RÜEGG MEIER ASSISTED CLIENTS IN KEEPING THEIR ASSETS CONCEALED AFTER THEIR CREDIT SUISSE ACCOUNTS WERE CLOSED

31. In or around 2008, the Credit Suisse private bank's Zurich branch began to close the accounts of U.S. persons. Rüegg Meier assisted her U.S. clients in several ways to keep their assets concealed, including the following:

    a. Rüegg Meier advised all of her U.S. clients that Credit Suisse would move the clients' accounts to Credit Suisse Private Advisors ("CSPA"), so long as the clients were willing to sign a Form W-9 disclosing their U.S. taxpayer identification information. Rüegg Meier and other Credit Suisse relationship managers understood that if a client was unwilling to transfer their accounts

and to sign a Form W-9, as most were, then the client most likely was not compliant with U.S. tax laws.

b. Rüegg Meier assisted a few U.S. customers to conceal their undeclared accounts by facilitating withdrawals of large quantities of cash from Credit Suisse in Zurich. For example, in or about 2008, Credit Suisse informed one U.S. customer that the bank planned to close the customer's account. Rüegg Meier assisted the customer in closing the account by withdrawing approximately $1 million in cash. Rüegg Meier advised the client to find another bank simply by walking along Bahnhofstrasse in Zurich and locating a bank which would be willing to open an account for the client. The customer placed the cash into a paper bag and exited the bank. Despite knowing that the customer planned to perpetuate the concealment of the assets by moving them to a nearby financial institution, the Defendant took no action to inform Credit Suisse's Legal and Compliance department of the client's illegal conduct.

c. Rüegg Meier recommended that a few U.S. clients open new accounts at other banks, such as Bank Frey and Wegelin & Co., and transfer their assets from their Credit Suisse accounts to the new accounts. For example, Rüegg Meier had inherited one U.S. client from the Credit Suisse branch in the Bahamas, after the Bahamas branch closed its U.S. persons' accounts. In or about 2008, when Credit Suisse's Zurich branch began closing U.S. persons'

15608866 1

accounts, Rüegg Meier advised the client to open a new account at another Swiss bank, and to transfer his funds to the new account.

### RÜEGG MEIER PROVIDED UNREGISTERED INVESTMENT ADVICE REGARDING SECURITIES

32. Although neither Credit Suisse nor Rüegg Meier were registered with the U.S. Securities and Exchange Commission, Rüegg Meier provided investment advice to U.S. customers while both traveling in the United States and by telephone from her office in Zurich, Switzerland. Credit Suisse had instituted an official policy that expressly forbade relationship managers from providing investment advice in the United States. However, to the best of Rüegg Meier's knowledge, none of her subordinates or other co-workers were ultimately disciplined or suffered adverse employment consequences for violating U.S. law and Credit Suisse policy by providing investment advice in the United States. Indeed, Rüegg Meier and other relationship managers deemed providing investment advice in the United States essential to retaining clients.

33. Just as he had pressured Rüegg Meier and others on the North American desk to travel to the United States in order to meet sales goals, Walder expected bankers to call into the United States and to attempt to make sales in the United States even though they were explicitly prohibited by U.S. law and Credit Suisse policies from doing so. Relationship managers were permitted to accept calls from U.S. clients and accept instructions to buy U.S. securities, but were not permitted to give advice. Nevertheless, Rüegg Meier and others did provide investment advice to the U.S. clients during these calls.

15608866 1

34. For example, the Defendant knew that Customers 10 and 11 were residents and citizens of the United States. Rüegg Meier assisted Customers 10 and 11 in obtaining securities to be held in their Zurich accounts in the following ways:

   a. In 2007, Rüegg Meier met with Customers 10 and 11 at a hotel in New York, New York, to discuss the investment strategy for an undeclared account held in Customer 11's name at Credit Suisse.

   b. Shortly thereafter, Rüegg Meier again met with Customer 10 at Credit Suisse in Zurich to discuss the investment strategy for the account. Rüegg Meier advised Customer 10 to open a second undeclared account in the name of a nominee tax haven entity in order to conceal Customer 11's ownership of the assets in the account.

   c. Again in 2007, Rüegg Meier and Dörig met with Customer 10 at Credit Suisse in Zurich to open a second undeclared account in the name of a nominee tax haven entity to conceal Customer 11's ownership of the account assets from the IRS.

   d. Later that year, Dörig created, or caused to be created, a separate nominee tax haven entity for Customer 11, and subsequently opened, or caused to be opened, an undeclared account at Credit Suisse in the name of that entity.

   e. In 2008, Rüegg Meier met with Customers 10 and 11 at a hotel in New York, New York to discuss investment strategies for all of their undeclared accounts at Credit Suisse.

15608866 1

35. Rüegg Meier met with U.S. clients at the Credit Suisse New York Representative Office, and accepted instructions from her clients to buy or sell securities. Rüegg Meier documented these transactions, but did so in a way such that it appeared that the client's instructions were not issued in the United States.

36. The acts taken by the defendant, Susanne D. Rüegg Meier, in furtherance of the offense charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to violate United States law. The Defendant acknowledges that the foregoing statement of facts does not describe all of the Defendant's conduct relating to the offense charged in the superseding indictment nor does it identify all of the persons with whom the Defendant may have engaged in illegal activities. The Defendant further acknowledges that she is obligated under her plea agreement to provide additional information about this case beyond that which is described in this Statement of Facts.

Respectfully submitted,

Dana J. Boente
United States Attorney

By: ~~Mark D. Lytle~~ Matthew Burke
Assistant United States Attorney

Stuart M. Goldberg
Acting Deputy Assistant Attorney General
U.S. Department of Justice, Tax Division

By: Mark F. Daly
Senior Litigation Counsel
Robert J. Boudreau
Trial Attorney

15608866 1



After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, Susanne D. Rüegg Meier, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Susanne D. Rüegg Meier
Defendant

I am Ms. Rüegg Meier's attorney. I have carefully reviewed the above Statement of Facts with her. To my knowledge, her decision to stipulate to these facts is an informed and voluntary one.

_____
Paula M. Junghans, Esq.
Counsel for the Defendant