IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Case No. 1:11CR00095-006 |
| v. | ) | Honorable Gerald Bruce Lee |
| **SUSANNE RÜEGG-MEIER** | ) | Sentencing: September 8, 2017 |
| | ) | 9:00 AM |

**DEFENDANT SUSANNE RÜEGG-MEIER'S SENTENCING MEMORANDUM**

Defendant, Susanne Rüegg-Meier, by her undersigned counsel, submits this memorandum in anticipation of sentencing.

## INTRODUCTION

Ms. Rüegg-Meier was indicted on one count of conspiring to defraud the United States in connection with the ascertainment, computation and collection of the income taxes of United States citizens on July 21, 2011. On July 19, 2017, she entered a plea of guilty to the one count indictment. Three other defendants who were charged along with Ms. Rüegg-Meier entered similar pleas; four defendants have not returned to the United States to face the charges. By her plea, Ms. Rüegg-Meier recognizes that she did in fact contribute to certain US citizens' aim to defraud their government of taxes owed to it. However, for the reasons explained below, Ms. Rüegg-Meier submits that the appropriate sentence in this case is – as it has been for many other similarly situated defendants – a period of probation. Defendant understands that the government intends to recommend a sentence of twenty-two months' incarceration. This memorandum explains why that recommendation is entirely unjust and should be rejected.

This memorandum discusses each of the factors the court must consider under the sentencing statute, 18 U.S.C. §3553(a).

## I. HISTORY AND CHARACTERISTICS OF THE DEFENDANT

### A. Background

Ms. Rüegg-Meier is 56 years of age. She has lived virtually her entire life in and around Zurich, Switzerland. The product of modest family circumstances, she managed through persistence and hard work to obtain higher education and a respectable position at Credit Suisse, one of Switzerland's most prestigious financial institutions.

Ms. Rüegg-Meier's father, Kurt, was the postmaster in the town of Steg and, later, Nürensdorf, where she was raised. Her mother worked as his assistant but largely devoted herself to raising Susanne, her elder sister and brother, Ursula and Beat, and her younger brother, Felix. But, in 1979, Mr. Rüegg died at the young age of 53. Mrs. Rüegg began to work full time, leaving Susanne – then aged 18 – in charge of the care of Felix, then aged 9.

After graduating from secondary school (the equivalent of US high school), Ms. Rüegg-Meier worked for three years in an apprenticeship with NCR. She returned to school at the age of 21, hoping to study sports, as she had always been very athletic and interested in an occupation in that area. But, because of medical issues with her knee, she decided that pursuing an education and career in sports was not feasible, and she did not want to go to university without a specific field in mind. In addition, she wanted to be financially independent and not rely on her mother for support So, instead of enrolling in university, she went to work, starting at Credit Suisse in 1985; for the next ten years, she worked in a variety of "back-office" jobs at Credit Suisse. In 1989, with the support of her employer, she enrolled in the University of Zurich and pursued her education while working about half-time at the bank in budgeting and

cost-control positions.  In 1994, after completing her Master's Degree in economics, she resumed full time employment with the bank.

In March 1995, Ms. Rüegg-Meier married Roger Meier.  When he was offered a position in Germany that year, she went with him, taking up employment at CommerzBank for a period of two years.  In 1998, the couple returned to Switzerland and Ms. Rüegg-Meier returned to Credit Suisse.  By that time, she was 37 years old, and aspired to a more visible role dealing directly with clients.  Because she was new to private banking, she started at the bottom of the hierarchy as an assistant.  In 1999, she was sent to New York to Swiss American Securities, an affiliate of Credit Suisse, for training in investment matters and to improve her English.

Ms. Rüegg-Meier returned to Zurich and to Credit Suisse later in 1999, and was assigned to serve as a "relationship manager" for a diverse portfolio of clients.  At that time, there was a "North American Desk" in the bank, but it did not handle all US clients.  Later, the bank decided to centralize all US clients under the North American Desk, and to designate certain relationship managers to handle those clients.  Ms. Rüegg-Meier was one of those relationship managers.  At that time, Ms. Rüegg-Meier had a handful of her own clients, but the remaining clients administered through the North American desk were already in place and she "inherited" the oversight of their accounts.  In July 2002, when Markus Walder took over responsibility for Region North America, Ms. Rüegg-Meier was named "head" of the North American Desk, reporting to him.  Roger Schaerer, head of the Representative Office in New York, and Marco Parenti, head of the North American desk in Geneva, also reported directly to Walder, and other relationship managers, including Bergantino and Augustoni, reported to her.  All of these individuals – but no one senior to them – are defendants in this case.

In 2009, following the announcement that Union Bank of Switzerland (UBS) had entered into a deferred prosecution agreement with the United States, Credit Suisse began to divest itself of US clients, transferring those who were willing to be tax-compliant to CSPA (Credit Suisse Private Advisors) in Switzerland or to Credit Suisse Private Bank in the United States, and closing the accounts of others who did not consent to transfer. It was Ms. Rüegg-Meier's responsibility to see to the re-assignment of the clients – by definition working herself out of a job. When the IRS initiated the first Offshore Voluntary Disclosure Program in 2009, she also worked with clients to collect information necessary for them to obtain the relief provided by the program and encouraged them to participate.

In February 2011 the first indictment in this case was returned, but it did not charge Ms. Rüegg-Meier. As Ms. Rüegg-Meier notes in her letter to the court, she reviewed the indictment and realized that some of the allegations were equally applicable to her, but she continued on with her employment trying to execute the bank's plan to keep only tax-compliant clients. On July 21, 2011, two others, including Ms. Rüegg-Meier, were indicted, an event she learned about from the press. Following the indictment, the bank placed Ms. Rüegg-Meier on "garden leave" – meaning that she remained on the payroll but was not permitted to come into work. Following the bank's entry of a guilty plea on May 19, 2014, the bank terminated Ms. Rüegg-Meier's "garden leave." Since then, she has – for obvious reasons – been unable to obtain any other employment in the financial services sector, the area in which she had spent her entire career.[1] And, her efforts to find meaningful employment of any other kind have been unsuccessful. She has earned very small amounts of income from giving skiing lessons and providing some organizational project work to a local business, but the stigma of the indictment, her age, time

---

[1] On May 4, 2015, a "Notice of Prohibition" was issued pursuant to §8(g) (1) (a) of the Federal Deposit Insurance Act, prohibiting her from engaging in any banking business in any bank, including a foreign bank, specified in the Act.

out of the work force, and inability to travel outside Switzerland have in effect forced her into early "retirement."

Ms. Rüegg-Meier and her husband have not had children. However, she maintains an extremely close relationship with her mother (now age 88) and her mother-in-law (now aged 84), both of whom live nearby. She is essentially responsible for taking care of the daily needs of both of these elderly family members. She has also developed a close bond with her ten year old nephew, Nils, who was born with paralysis on one side of his body. An accomplished golfer and skier herself, Ms. Rüegg-Meier has undertaken to teach these sports to Nils, who has blossomed under her guidance. Indeed, the positive unintended side effect of her involuntary departure from the workforce is that it has allowed her to devote herself to her family in ways that she could not when she was working full time.

Ms. Rüegg-Meier's husband, Roger, is an administrator at a university in Zurich. Fortunately, his employment has been sufficient to support the couple during Ms. Rüegg-Meier's unemployment, but the arrangement weighs on Ms. Rüegg-Meier, who had always shared in the family's expenses, and it is difficult for her to be in the role of a dependent.

As those who know her best have written to the court, Ms. Rüegg-Meier is a diligent, loyal, hardworking "team player." She was ambitious but only in the best sense – striving to do a good job within what she understood the rules to be. She was – and is – not a public person, but a very private one who tried to do her best for her family, friends, coworkers, and employer. Between her and her husband's earnings, the couple enjoyed a comfortable but not ostentatious lifestyle.

Since the charges in this case, Ms. Rüegg-Meier has not only been removed from the workforce, but has been unable to enjoy many of the pursuits she and her husband worked and

planned for. Other than for events related to this case, she has not left Switzerland in more than six years. The professional circles in which she once felt comfortable have been closed to her. Efforts to reach out to former colleagues have been rebuffed. Always precise and careful but essentially upbeat, she has become anxious, distracted and fearful of the future.

### B. Ms. Rüegg-Meier in Her Own Words and As Others See Her

Ms. Rüegg-Meier will exercise her right of allocution but we want the court to hear from her directly and more completely while it is considering the sentence in advance. Accordingly, attached hereto as Exhibit A is her letter describing her involvement in this offense and the impact this proceeding has had on her. Also attached are letters from the following persons:

- Roger Meier – the defendant's husband (Exhibit B)

- Ursula Dormayer-Rüegg – the defendant's sister (Exhibit C)[2]

- Felix Rüegg – the defendant's brother (Exhibit D)

- Reto Himmel – a colleague who worked with the defendant in Operations at Credit Suisse (Exhibit E)

- Joseph Haering – a former colleague at Credit Suisse (Exhibit F)

- Oliver Kehl – a longstanding friend (Exhibit G)

- Werner Haselbach – a former colleague in Operations at Credit Suisse (Exhibit H)

- Esther Nägeli – an attorney and longstanding friend (Exhibit I)

## II. NATURE AND CIRCUMSTANCES OF THE OFFENSE.

The Court is well aware of the history of this case, and the forces at work within Credit Suisse in particular and the Swiss banking industry in general that led to these charges. Ms.

---

[2] Letters which were submitted in German have been translated by an independent translator. The English translation appears immediately behind the signed German version.

Rüegg-Meier was a cog in a wheel that was invented long before she came to Credit Suisse. Even though her clients almost never overtly declared to her that they were not properly reporting their incomes to the United States, she observed enough to conclude that many of them were not. She did not recruit the clients with promises of bank secrecy; she inherited clients who had already made that choice. She also inherited some clients she believed were tax compliant because they routinely asked for documents necessary to report their income properly. But, she chose to follow a pattern of behavior devised by her superiors and predecessors in the bank to assist the non-compliant clients in that goal. That she was uncomfortable following many of the practices prescribed by the bank does not excuse or change the fact that she engaged in them. Like many Swiss bankers and other professionals, she convinced herself that US taxpayers' deceit toward the Internal Revenue Service was not her problem – but she knew that she was doing things that assisted that deceit. Coming to grips with that reality has required significant soul-searching on her part and an acknowledgement that the solid and valuable services she thought she was providing to her employer and clients were tainted and overshadowed by their improper aspects.

Nevertheless, Ms. Rüegg-Meier bit that bullet and voluntarily came to this court to acknowledge her wrongdoing and take responsibility for it. Her entry into the United States, arrest and twenty-four hour detention in the Alexandria Detention Center were an extremely unsettling experience for someone who has never had so much as a traffic ticket, but she submitted to it because she has resolved to accept responsibility for her conduct.

### III. THE SENTENCE SHOULD REFLECT THE SERIOUSNESS OF THE OFFENSE, PROMOTE RESPECT FOR THE LAW, PROVIDE JUST PUNISHMENT, AND AFFORD ADEQUATE DETERRENCE TO CRIMINAL CONDUCT.

These factors, set forth at 18 U.S.C. §3553(2)(A) and (B), all relate to the notion that any sentence imposed should be meaningful in the context of the case in which it is imposed, and should not only advance general deterrence but should be viewed as fair. From the vantage point of 2017, following almost a decade of assault on Swiss bank secrecy by the United States and a true sea-change in the banking culture in that country, it is difficult to see how incarcerating this one mid-level Swiss banker (the only woman among all the professionals charged) would achieve any more general deterrence or convince anyone not already convinced that they need to take their tax obligations seriously.

We recognize that the government takes the position that a person who comes into court for a guilty plea later in the process than others (here, fourth out of eight defendants) should not be "rewarded" for waiting. But that view is, we submit, from the wrong end of the telescope. Ms. Rüegg-Meier has not simply been enjoying her life as she otherwise would have had this case never been brought. Her life has forever been altered; significant consequences from her actions have already befallen her. And the issue has not faded from the public consciousness in Switzerland; following the entry of her guilty plea, Swiss news outlets proclaimed the guilty plea, resuscitating notoriety that would not have arisen had she continued to just go along quietly in Switzerland. See, Exhibit J hereto (reports of guilty plea from Swiss press).

So, if the purpose was to deter other Swiss bankers from abetting US tax evaders, that message is already clear. If the purpose was to deter other US taxpayers, it is not at all clear that the prosecution of Swiss bankers was the way to get the message across. Indeed, it is notable that just within the last few months, the United States prosecuted in this district an individual

8

who was a US taxpayer with more than $200 million in Swiss accounts who maintained those accounts *through 2015*. *United States v. Horsky,* No. 1:16-cr-00224-TSE.

## IV. KINDS OF SENTENCES AVAILABLE

Although theoretically any kind of sentence is available in this case, there are realistically only two possibilities: incarceration or probation. Since Ms. Rüegg-Meier has neither a residence nor employment in the United States, neither home confinement nor community confinement is feasible. Ms. Rüegg-Meier is already serving and supporting her family members who need assistance in Switzerland, but a formal program of community service is not administrable. The court could sentence the defendant to "time served" for the one day spent in custody upon her surrender in the United States. At least one court has imposed a sentence of one day. See *United States v. Reiss*, *infra,* but in that case the one day was followed by three years of supervised release, where the defendant resided in the United States. Ms. Rüegg-Meier does not require supervision.

For the reasons explained herein*,* Ms. Rüegg-Meier therefore respectfully seeks a probationary sentence.

## V. THE ADVISORY SENTENCING GUIDELINES RANGE

The Defendant and the United States have agreed that the base offense level based on a tax loss of $3.5 - $9 million is 24, and that a two level enhancement for "sophisticated means" is appropriate. USSG §§2T1.9 (a) (1), 2T1.1, 2T4.1 (j), 2T1.1 (b) (1). They have also agreed that a two-level decrease pursuant to USSG §3E1.1(a) is warranted, and that, if the offense level is 16 or greater (as it is), the government will request an additional one-level decrease pursuant to USSG §3E1.1(b). Thus, the resulting Guidelines range is 23 (46-57 months).[3]

---

[3] As reflected in the PSR, Ms. Rüegg-Meier falls into Criminal History Category I, as she has no prior convictions or violations of any kind.

The plea agreement further provides that the parties are free to argue other provisions of the Sentencing Guidelines not stipulated in the plea agreement. The government has argued for and the PSR adopts the position that there should be an "aggravating role" increase of three levels under USSG §3B1.1 because Ms. Rüegg-Meier was a "manager or supervisor (but not an organizer or leader")" in a criminal activity that involved five or more participants or was otherwise extensive." Ms. Rüegg-Meier does not dispute that there were five or more participants in the tax evasion committed by clients of Credit Suisse and abetted by her, other Credit Suisse employees, and other financial advisors, but she does dispute that a three level increase – or, indeed, any increase - is warranted given the realities of her role in Credit Suisse's operations.

Ms. Rüegg-Meier had the impressive-sounding title of "head of the North American desk." But her actual function was to try to meet goals set by those above her (get more clients, get more funds under management, get more "discretionary mandates") and to follow practices established by those who came before her, some of which effected US taxpayers' aim of concealing their income and assets from the Internal Revenue Service. It is true that Ms. Rüegg-Meier nominally supervised other relationship managers, but only in the sense that she monitored their performance under the same goals and procedures that applied to her, none of which she created. The Guidelines commentary on this issue is instructive, pointing out that, "It is…likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate." Commentary to USSG §3B1.1. The PSR presents no information about Ms. Rüegg's profit from the offense. In fact, she received only her routine salary. The profit from

the offense was realized by the bank and by the US taxpayers who underpaid their taxes. Nor is the concern about recidivism or danger to the public relevant here.

Moreover, the enhancement is intended to reflect a comparison of the defendant's conduct with that of the "average participant" in the offense. The PSR maintains that the "average participants" in this offense were Messrs. Bachmann, Dörig and Bergantino and that they therefore received no role enhancements, but this analysis is misplaced. Bachmann and Dörig were independent self-employed professionals who used their expertise to create accounts and entities for US taxpayers attempting to conceal their assets. Bergantino was a relationship manager who reported to Ms. Rüegg-Meier for a period of time and was, in that sense, junior to her. But, we respectfully suggest that this is not the universe of the relevant participants in the conspiracy described in the Superseding Indictment. The Indictment cites by name only bankers and other professionals, but it also refers to "other conspirators known and unknown." Those "other conspirators" were, plainly, the US taxpayers who were the primary profiteers from the conspiracy. Thus, any attempt to evaluate culpability by looking at the "average participant" in an offense must take into account all of the participants, not just a select few. Ms. Rüegg-Meier certainly cannot be viewed as "supervising" or "managing" the taxpayers for whose benefit the conspiracy existed.

Although Ms. Rüegg-Meier has not argued for a reduction for a "mitigating role" in the offense, the Guidelines commentary concerning such adjustments is also useful, pointing out that such a reduction is appropriate for "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks." Even "the fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative. Such a defendant may receive an adjustment under this guideline if he or she is

substantially less culpable than the average participant in the criminal activity." USSG §3B1.2, Application Note 3(C).

Thus, the accuracy of the determination that Ms. Rüegg-Meier deserves an enhancement depends on assessing her conduct against a properly-defined group of participants. Swiss banking practices – and those of Credit Suisse – were in place long before Ms. Rüegg-Meier joined the bank's back office in 1985, and long before the North American desk was expanded and she was assigned to it. The American clients whom Ms. Rüegg-Meier was assigned to serve had already opened their accounts and made their own decisions about their tax compliance well before she came on the scene. She received no proceeds of the fruits of the crime, did not set the goals, or decide how to implement them. Therefore, the proposed enhancement should not apply.

In any event, of course, the Guideline calculation is merely advisory, and the Court is free to impose any sentence it believes appropriate after taking into account all of the factors included in 18 U.S.C. §3553. *United States v. Booker*, 543 U.S. 220, 245-46 (2005).

VI. **THE SENTENCE SHOULD PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT, PROVIDE THE DEFENDANT WITH NEEDED EDUCATION, TRAINING, MEDICAL CARE OR OTHERCORRECTIONAL TREATMENT.**

These factors, 18 U.S.C. §3553(a)(2)(C) and (D) are also interrelated, and are largely irrelevant here. There is absolutely no reason to believe Ms. Rüegg-Meier will have anything to do with any US taxpayers, much less to assist them with evading their taxes. She does not require education or training of any kind, nor any medical care or other correctional treatment.

## VII.  THE SENTENCE SHOULD AVOID UNWARRANTED DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT.

Defendant submits that this factor, 18 U.S.C. §3553(a)(7), is the most significant in the context of this case.  To be clear, Ms. Rüegg-Meier does not presume that merely because other defendants in this case – and defendants in other cases – have received probationary sentences she is "entitled" to the same result.  But, this case arises among several unusual circumstances.

First, the "Offshore Voluntary Disclosure Program" (OVDP) initiated by the Internal Revenue Service for taxpayers who had failed to comply with their tax obligations offered full criminal amnesty to even the most grossly culpable tax evaders.  At last report, more than 54,000 US taxpayers have availed themselves of the program, and $8 billion has been collected. https://www.irs.gov/newsroom/offshore-compliance-programs-generate-8-billion-irs-urges-peope-to-take-advantage-of-voluntary-disclosure-programs (last updated 8/4/2017).   No such opportunity was made available to Ms. Rüegg-Meier.

Second, the "Swiss Bank Program" administered by the Department of Justice permitted dozens of Swiss banks "that had reason to believe that they had committed tax-related criminal offenses in connection with undeclared U.S.-related accounts" to engage in a similar "voluntary disclosure" arrangement and receive a non-prosecution agreement.  78 Swiss banks did so. [4] https://www.justice/gov/tax/swiss-bank-program.  But, there was no "voluntary disclosure" program for individual Swiss bankers, such as this defendant.  It is indeed ironic that while Ms.

---

[4]  Credit Suisse was not eligible for the Swiss bank program, having been indicted before the program was launched. Ultimately, Credit Suisse itself entered a guilty plea to conspiracy to file tax returns, and paid large civil penalties and restitution.

Rüegg-Meier did facilitate tax evasion on the part of some of her clients, she also assisted many of them with their participation in the OVDP.[5]

Third, the disparity that would result if Ms. Rüegg-Meier were incarcerated, when compared to sentences imposed on like defendants, simply cannot be ignored. It is appropriate for the court not only at other defendants in this case or district but to look "nationwide to similarly situated criminal defendants of similar culpability that have committed similar acts resulting in similar convictions with similar backgrounds and with similar records under similar circumstances." *United States v. Doan*, 498 F. Supp. 2d 816, 820 (E.D. Va. 2007). When that nationwide review is undertaken, the record is compelling:

- **Josef Dorig** (co-defendant) – creator and manager of offshore trusts.
  5 years unsupervised probation; $$125,000 fine.

- **Andreas Bachmann** (co-defendant) – private banker and asset manager.[6]
  5 years unsupervised probation; $100,000 fine.

- **Michele Bergantino** (co-defendant) – Credit Suisse relationship manager.
  2 years unsupervised probation; $10,000 fine.

- **Igor Olenicoff**, (Case No. -08-CR-227, CD Ca.) US taxpayer; $52 million tax loss; $200 million in offshore accounts. 2 years probation.

- **Hansreudi Schumacher** (Case No. 09-cr-60210, SD Fl.) Private banker, head of North American desk at UBS, asset manager at Neüe Zurcher bank. Indicted in 2009, voluntarily surrendered in 2014. 5 years unsupervised probation, $150,000 fine.

- **Juergen Homann** (Case No. 09-CR-724). US taxpayer. $5 million offshore account. 5 years probation; 300 hours community service.

- **Steven Rubinstein** (Case No. 09-CR-60166, SD Fl.) US taxpayer. $7 million in offshore accounts. 3 years probation; 12 months home detention.

---

[5] *See* description of her commitment to this process described in the letter of Joseph Haering, Exhibit F.

[6] Although Mr. Bachmann is a co-defendant in this case, Ms. Rüegg-Meier never had any dealings with him.

- **John McCarthy** (Case No. 09-CR-784, CD Ca.)  US taxpayer.  $1 million UBS account.  3 years probation; 6 months home detention; 300 hours community service.

- **Jeffrey Chatfield** (Case No. 10-CR-4546, SD Ca.)  US taxpayer with UBS account in name of nominee entity.  3 years' probation.

- **Leonid Zaltsberg** (Case No. 10-CR-437, D. NJ)  US taxpayer.  Hid funds ins UBS accounts and nominee Panama corporation.  4 years probation; 12 months home detention.

- **Ernest Vogliano** (Case No. 10-CR-00327, SD NY).  US taxpayer.  Held UBS accounts in names of Liechtenstein and Hong Kong shell corporations.  2 years probation.

- **Jules Robbins** (Case No. 10-CR-333, SD NY).  US taxpayer.  $42 million in UBS accounts in name of sham Hong Kong corporation. 12 months probation.

- **Andrew Silva** (Case No. 10-CR-00044, ED Va. (O'Grady, J.)  US taxpayer.  Structured currency transactions from offshore account.  2 years probation, 4 months home detention, 100 hours community service.

- **Paul Zabczuk** Case No. 10-CR-60112, SD Fl.)  US taxpayer.  Received payments from foreign clients through undisclosed foreign accounts in Bahamas and Switzerland.  3 years probation; 12 months home detention; 150 hours community service.

- **Renzo Gadola** (Case No. 10-cr-20878 SD Fl.)  Executive director at UBS and independent asset manager with hundreds of undeclared accounts.  Arrested while meeting with US client to discourage participation in OVDP.  5 years probation.

- **Martin Lack** (Case No. 11-cr-60184, SD Fl.)  Executive director at UBS for 17 years; actively solicited customers for bank secrecy and discouraged OVDP participation.  5 years probation; $7,500 fine.

- **Arvind Ajuha** (Case No. 11-CR-135, ED Wi.)  US taxpayer.  $8.5 million in undisclosed HSBC account.  <u>After trial</u>, 3 years probation, 3 months home detention, 450 hours community service, $350,000 fine.

- **Ashvin Desai** (Case No. 11-CR-846, ND Ca.)  US taxpayer.  $8.4 million in undisclosed HSBC account.  <u>After trial</u>, 6 months incarceration; 6 months home detention.

- **Mary Estelle Curran** (Case No. 12-80206, SD Fl.)  US taxpayer.  $47 million undisclosed Swiss account.  Probation imposed and immediately terminated.

15

- **Christos Biagios** (Case No. 12-cr-60260, SD Fl.) Executive director at UBS; arrested while meeting with clients in US. Time served (37 days).

- **Michael Reiss.** (Case No. 11-cr-0668, SD NY). US taxpayer. Inherited and did not disclose $2.5 million in Swiss account held in nominee names. 1 day incarceration, 3 years supervised release.

- **Sybil Upham** (Case No. 14-CR-82, SD NY) US taxpayer. Unreported accounts at UBS and in Liechtenstein foundation. 3 years probation; 300 hours home detention.

- **Warner, Ty.** (792 F. 3d 847 (7th Cir. 2015) $200 million in offshore accounts. 2 years probation; community service.

- **Albert Cambata** (Case No. 15-CR-362, ED Va. (Hilton, J. )) $12 million transferred from Belize to Switzerland using Hong Kong entity; later moved to Singapore and Monaco. 1 year probation; $15,000 fine.

- **Dan Horsky** (Case No. 1:16-cr-00224, ED Va. (Ellis J.)) More than $200 million in offshore accounts, including Credit Suisse, continuing through 2015. Largest FBAR penalty ever paid. 7 months incarceration; community service.

To be sure, there are a variety of circumstances that affected the sentences imposed in each of these cases. Some of the defendants paid very large civil penalties; some had extraordinary personal circumstances; some concealed their accounts but did not actually have much unreported income; some went to trial and did not "accept responsibility" but were still sentenced to probation. Nevertheless, the unmistakable theme that emerges is that punishment may take many forms, and that the one-size-fits-all idea that incarceration is always required is not gaining traction in these cases.

This court itself has plainly expressed its view that "the guidelines here are quite excessive…[they] are driven typically in a situation where someone is a tax cheater…the focus should be on the taxpayers." (Sentencing of Michele Bergantino). That the United States would persist in recommending a sentence of 22 months (more than three times that imposed on

Horsky, the taxpayer who held the largest Swiss account ever prosecuted) is simply unfathomable. The recommendation lacks any rational foundation and should be rejected.

**VIII.   NO RESTITUTION IS DUE AND NO FINE SHOULD BE IMPOSED.**

As agreed in the plea agreement, no restitution is due because it has already been paid. Defendant also respectfully submits that no fine should be imposed.  As explainedpreviously, Ms. Rüegg-Meier has not worked for the last six years and few realistic prospects for future employment that would generate any meaningful income. Despite having worked since a young age to be economically independent, she now finds herself fully dependent on her husband's financial support.  Her savings are modest, especially taking into account that she lives in one of the most expensive cities in the world.   She has no current income to speak of; although she earned a few thousand dollars in 2016, she has had no earnings in 2107.[7]  In short, the economic punishment for this offense has already been imposed.

---

[7] The PSR recites that the Meiers have joint net excess cash flow of more than $10,000 per month.  Defendant believes this is in error, since the cash flow statement she submitted to Probation reported approximately $2400 per month joint net excess cash. Counsel is attempting to address this with Probation.   In any event, any excess cash is attributable to Mr. Meier's earnings, since the defendant has none.

## IX. CONCLUSION

Susanne Rüegg-Meier is decent and honorable person who worked in an industry and a country that have for decades countenanced and sponsored conduct that violates US law. By her guilty plea, she is one of a very small handful of representatives of that industry to have admitted <u>personal</u> culpability to the United States. Her life has been forever changed. Neither the interests of the United States nor any sense of "justice" require that she go to jail so that the United States can achieve some elusive degree of further deterrence. Defendant respectfully requests that the Court sentence her to a period of probation.

Respectfully submitted,

*/s/ R. Miles Clark*
R. MILES CLARK (#65339)
mclark@zuckerman.com
PAULA M. JUNGHANS (*Pro Hac Vice*)
pjunghans@zuckerman.com
Zuckerman Spaeder LLP
1800 M Street NW
Washington DC 20036
T: 202-778-1800
F: 202-822-8106
*Attorneys for Defendant Susanne Rüegg-Meier*

6183531.1

## CERTIFICATE OF SERVICE

I hereby certify that on September 1, 2017, I caused the foregoing Sentencing Memorandum to be filed with the Clerk of Court using the CM/ECF system.

> */s/ R. Miles Clark*
> R. Miles Clark